2006 UT 50

**STATE of Utah, Plaintiff and Respondent,**

v.

**Ralph LEVIN, Defendant and Petitioner.**

**No. 20050001.**

Supreme Court of Utah.

Sept. 8, 2006.

---

Mark L. Shurtleff, Att'y Gen., Erin Riley, Asst. Att'y Gen., Salt Lake City, for plaintiff.

Margart P. Lindsay, Orem, for defendant.

On Certiorari to the Utah Court of Appeals

DURRANT, Justice:

## INTRODUCTION

¶ 1 The Fifth Amendment to the United States Constitution protects against self-incrimination.[1]  To preserve this right, the U.S. Supreme Court has held that defendants subjected to custodial interrogation are entitled to a *Miranda* warning.[2]  Where such a warning is not given, any incriminating statements made by a defendant during the custodial interrogation are excluded from evidence.[3]  We granted certiorari in this case to clarify the standard of review to be applied by a Utah appellate court in reviewing a trial court's decision on whether a defendant was subjected to custodial interrogation.

¶ 2 Following a jury trial, defendant Ralph Levin was found guilty of possession of marijuana and possession of drug paraphernalia. He challenged his convictions before the Utah Court of Appeals, arguing that the trial court had erred in failing to suppress certain incriminating statements he made to police officers without the benefit of a *Miranda*

---

1. U.S. Const. amend V.

2. *See Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

3. *Rhode Island v. Innis*, 446 U.S. 291, 297, 300–01, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980); *Miranda*, 384 U.S. at 444–45, 86 S.Ct. 1602; *Salt Lake City v. Carner*, 664 P.2d 1168, 1170 (Utah 1983).

warning. In particular, he contended that the trial court had erred in concluding that the officers had not subjected him to "custodial interrogation."

¶ 3 The court of appeals upheld Levin's convictions. It held that the trial court had erred when it concluded that Levin was not interrogated but affirmed the trial court's determination that he was not "in custody."[4] In so doing, the court of appeals expressly applied an "abuse of discretion" standard to the custody determination.[5] It did not specify the standard of review that it applied to the trial court's interrogation determination.[6] On certiorari, Levin challenges the court of appeals custody determination, arguing that it was error for the court of appeals to apply the deferential "abuse of discretion" standard of review.

■ ¶ 4 Because the "custody" and "interrogation" elements of a trial court's custodial interrogation determination overlap and together serve to answer a single inquiry into whether a *Miranda* warning was necessary in a particular case, we address the standard of review for the trial court's custodial interrogation determination as a whole. A trial court's application of the legal concept of custodial interrogation to the facts of a particular case presents a mixed question of fact and law. Therefore, we select the appropriate standard of review using the general factors and policy considerations that we have discussed in *State v. Pena*[7] and its progeny. However, we take this opportunity to revise our statement of the original four factors from *Pena* into a three-factor, policy-based balancing test. We then conclude that the three factors of this revised balancing test weigh in favor of reviewing for correctness a trial court's custodial interrogation determination.

¶ 5 Ultimately, the important policy of promoting uniformity in police officers' administration of *Miranda* warnings and in courts'

application of *Miranda* to exclude a defendant's incriminating statements mandates greater appellate involvement in defining the concept of custodial interrogation as it applies to the facts of individual cases. Because the court of appeals applied a deferential standard in reviewing the trial court's determination that Levin was not in custody, we remand to the court of appeals for application of the "correctness" standard of review.

## BACKGROUND

¶ 6 Because our opinion is concerned only with defining the appropriate standard of review, we limit our discussion of the facts in this case. Although somewhat abbreviated, our factual discussion incorporates undisputed facts established at trial as well as those found by the trial court in connection with Levin's initial motion to dismiss. We consider undisputed facts from trial because at the beginning of the trial Levin made an appropriate continuing objection to the introduction of his incriminating statements by renewing his earlier motion to suppress those statements.[8]

¶ 7 Levin's convictions for drug offenses are based on evidence gathered during an approximately one-and-one-half hour traffic stop on the Provo Dike Road in a rural area near Utah Lake. Deputy Wayne Keith of the Utah County Sheriff's Office was on patrol when he noticed a convertible bearing expired registration tags parked on the side of the road. Three occupants were sitting in the convertible with the roof down. Without activating his lights or siren, Deputy Keith parked behind the convertible. He approached on foot and saw several open containers of alcohol in plain view inside the convertible.

¶ 8 Deputy Keith asked the convertible's occupants for identification. Levin was in

---

4. *State v. Levin*, 2004 UT App 396, ¶¶ 11, 22–23, 101 P.3d 846.

5. *Id.* ¶ 7.

6. *See id.* ¶¶ 7, 11.

7. 869 P.2d 932, 935–40 (Utah 1994).

8. *See State v. Johnson*, 748 P.2d 1069, 1076 (Utah 1987) (Durham, C.J., concurring separately, joined by Howe & Zimmerman, JJ.) (indicating that there will be sufficient notice of a continuing objection if counsel renews the objection at trial outside the presence of the jury).

the driver's seat, Michael Winger was a passenger in the front seat, and Richard Johnson was sitting in the backseat. Deputy Keith had all three men step out of the vehicle and notified them that he was going to search for more open containers. His search of the vehicle's center console uncovered an odor of marijuana and a metal "socket" tool that had been fashioned into a pipe, which appeared to contain burnt and unburnt marijuana. Deputy Keith also found several small bags of marijuana in a backpack claimed by Johnson.

¶ 9 There is some dispute over the precise chronology of the following events, but the record establishes that Deputy Keith called in two deputies who were certified drug recognition experts. Because the vehicle belonged to Levin and he had been sitting in the driver's seat, Deputy Keith pulled Levin aside and personally subjected him to a sobriety test designed to identify alcohol impairment. He passed. The drug recognition experts then subjected Levin to additional field sobriety tests. Those officers determined that Levin had a fast pulse rate and a lack of convergence of the eyes. They informed Deputy Keith that they believed Levin was under the influence of marijuana. At some point, either before or after these tests, Deputy Keith asked Levin at least once about the socket, and Levin asserted that he knew nothing about it and had not smoked marijuana. Deputy Keith also patted Levin down but found no marijuana and no scent of marijuana on him.

¶ 10 However, after the drug recognition experts presented their conclusions to Deputy Keith, Deputy Keith pulled Levin aside and stated: "There's no doubt in my mind that you've been smoking marijuana." Deputy Keith's accusation was not phrased in the form of a question, and Deputy Keith was not "in Levin's face." Deputy Keith testified that he did not expect a response because Levin had already denied using marijuana. Nevertheless, Levin answered by saying that "he had taken a couple of hits" with Richard Johnson but that Michael Winger had not used any marijuana. He also added that they had smoked out of a pipe that the

officers had not located. At no time was Levin formally arrested, handcuffed, or given a *Miranda* warning, although he was issued a citation.

¶ 11 In addition to the investigation of Levin, the officers questioned the two passengers. The officers briefly questioned Winger about smoking marijuana. They read Johnson his *Miranda* rights and questioned him about the marijuana found in his backpack. Johnson admitted that he had been smoking with Levin, but later said that he had smoked the marijuana alone. When the officers had completed their investigation, they allowed Levin and his passengers to leave in the convertible. As the convertible started to drive away, one of the officers spotted a pipe located directly under the convertible. The officers stopped the convertible, and Deputy Keith asked if this was the pipe they had used to smoke. Johnson stated that it was.

¶ 12 Levin was later charged with possession and use of marijuana, possession of drug paraphernalia, and with having an open container in a vehicle. Levin pleaded no contest to the open container charge. With regard to the drug offenses, he pleaded not guilty and then moved to suppress the incriminating statements he had made to Deputy Keith, arguing that despite being subjected to custodial interrogation, he had not been given the required *Miranda* warning. The trial court denied the motion. It determined that Levin had not been in custody or subject to interrogation. At the commencement of trial, Levin renewed his motion, which the trial court again denied. Following the trial, a jury found Levin guilty of both possession of marijuana with a prior conviction and possession of drug paraphernalia.

¶ 13 On appeal, the court of appeals concluded that Levin had been subjected to "interrogation," but it applied a deferential "abuse of discretion" standard of review to the trial court's determination that Levin was not "in custody" and affirmed that determination.[9] It did not specify the standard of review that it applied to the trial court's interrogation determination.

¶ 14 Levin now challenges the court of appeals' decision, arguing that the court of

---

**9.** *State v. Levin*, 2004 UT App 396, ¶¶ 7, 11, 22–23, 101 P.3d 846.

appeals erred in reviewing the trial court's custody determination under a deferential abuse of discretion standard. We granted Levin's petition for certiorari to decide whether the court of appeals applied the correct standard of review. We have jurisdiction pursuant to Utah Code section 78–2–2(5).

## STANDARD OF REVIEW

¶ 15 On certiorari, we review for correctness the decision of the court of appeals, not the decision of the trial court.[10] The correctness of the court of appeals' decision turns, in part, on whether it accurately reviewed the trial court's decision under the appropriate standard of review.[11]

## ANALYSIS

¶ 16 Levin argues that the court of appeals erred in reviewing the trial court's determination that he had not been "in custody" under an "abuse of discretion" standard. We agree. The importance of uniformity in Utah courts' application of Fifth Amendment *Miranda* protections leads us to conclude that Utah appellate courts should review for correctness trial courts' custodial interrogation determinations.

¶ 17 We will begin our analysis by describing the policy-based balancing test that guides our selection of a standard of review for mixed questions of fact and law. We will then apply this balancing test to the mixed question of custodial interrogation.

## I. WE DETERMINE THE STANDARD OF REVIEW FOR A MIXED QUESTION OF FACT AND LAW BY EMPLOYING A POLICY–BASED BALANCING TEST

¶ 18 In selecting the deferential standard of review that it applied to the trial court's

"custody" determination in this case, the court of appeals engaged in an incomplete analysis of the factors that we discussed in *State v. Pena*[12] and did not adequately consider the policy implications that we highlighted in *State v. Brake*.[13] Given the lingering difficulties in the application of our standard of review jurisprudence, we take this opportunity to further discuss the role of policy in our selection of a standard of review and to refine our statement of the balancing test that we use in selecting a standard of review for a mixed question of fact and law.

### A. Standards of Review Apportion Power Between the Trial and Appellate Courts Based on the Courts' Institutional Competencies

¶ 19 We have previously explained that "[t]he primary function of a standard of review is to apportion power and, consequently, responsibility between trial and appellate courts for determining an issue."[14] Standards of review should allocate discretion between the trial and appellate courts in a way that takes account of the "relative capabilities of each level of the court system to take evidence and make findings of fact in the face of conflicting evidence, on one hand, and to set binding jurisdiction-wide policy, on the other."[15] These considerations are critical in selecting a standard of review from along a spectrum of deference that runs from highly deferential review under a "clearly erroneous" standard on one end to completely nondeferential review under a "correctness" standard on the other end.[16]

¶ 20 Because a trial court is in a better position to "judg[e] credibility and re-

---

10. *State v. Brake*, 2004 UT 95, ¶ 11, 103 P.3d 699.

11. *Id.*

12. 869 P.2d 932, 939 (Utah 1994).

13. 2004 UT 95, ¶ 14, 103 P.3d 699.

14. *State v. Thurman*, 846 P.2d 1256, 1265–66 (Utah 1993).

15. *Id.* at 1266.

16. *See Pena*, 869 P.2d 932, 936 (Utah 1994) ("[O]ne can visualize the traditional standard-of-review scheme as a continuum of deference anchored at either end by the clearly erroneous and correction-of-error standards, which correspond with whether the issue is characterized as one of fact or of law.").

solv[e] evidentiary conflicts," an appellate court reviews the trial court's findings of fact for clear error.[17] Conversely, an appellate court reviews a trial court's conclusions of law for correctness because "a single trial judge is in an inferior position to determine what the legal content of [a legal concept] should be [whereas] a panel of appellate judges, with their collective experience and their broader perspective, is better suited to that task."[18] Additionally, the published decisions of appellate courts "provid[e] statewide standards that guide law enforcement and prosecutorial officials."[19]

¶ 21 The analytical complexity of our standard of review is at its height when we review a trial court's application of a legal concept to a given set of facts. When we review so-called "mixed questions of fact and law," the considerations that favor a more-deferential standard of review and those that favor a less-deferential standard of review compete for dominance, and the amount of deference that results will vary according to the nature of the legal concept at issue. Mixed questions of fact and law involving different legal issues will often require different standards of review.[20]

¶ 22 While we have said that, ultimately, "the legal effect of [the] facts is the province of the appellate courts,"[21] our prior decisions recognize that, with regard to many mixed questions of fact and law, it is either not possible or not wise for an appellate court to define strictly how a legal concept is to be

applied to each new set of facts.[22] Where the correct application of a legal concept is difficult to explain using a generally applicable standard, overinvolvement by an appellate court can lead to confusing and inconsistent pronouncements of the law.[23] We have recognized that the application of such a legal concept incorporates a de facto grant of discretion to the trial court, and, accordingly, we review the trial court's decision on the mixed question of fact and law with deference commensurate to that discretion.[24]

¶ 23 But with regard to certain mixed questions where uniform application is of high importance, as in the context of Fourth Amendment protections, we have held that policy considerations dictate that the application of the legal concept should be strictly controlled by the appellate courts.[25] Thus, if we determine that society's interest in establishing consistent statewide standards outweighs other considerations, we grant no discretion to the trial court, and we review the mixed question for correctness.[26]

¶ 24 We have described the varying levels of discretion afforded trial courts in *Pena* and *Brake* using Professor Maurice Rosenberg's pasture metaphor, which describes the discretion given to a trial court on a particular mixed question as a pasture bounded by fences that represent the boundaries of the legal concept.[27] Because the established boundaries of each legal concept are unique, different mixed questions are associated with

---

17. *Thurman*, 846 P.2d at 1271.

18. *Id.; accord Pena*, 869 P.2d at 936 ("[A]ppellate courts have traditionally been seen as having the power and duty to say what the law is and to ensure that it is uniform throughout the jurisdiction.").

19. *Thurman*, 846 P.2d at 1271.

20. *See Pena*, 869 P.2d at 938; *see also Searle v. Milburn Irrig. Co.*, 2006 UT 16, ¶ 16, 133 P.3d 382 ("The measure of discretion afforded varies, however, according to the issue being reviewed." (internal quotation marks omitted)).

21. *Drake v. Indus. Comm'n*, 939 P.2d 177, 181 (Utah 1997) (internal quotation marks omitted).

22. *See Pena*, 869 P.2d at 938–40.

23. *Id.* at 940.

24. *Id.* at 937–39; *State v. Virgin*, 2006 UT 29, ¶ 27, 137 P.3d 787.

25. *See Brake*, 2004 UT 95, ¶¶ 14–15, 103 P.3d 699; *see also State v. Hansen*, 2002 UT 125, ¶ 26, 63 P.3d 650 (stating that there must be "statewide standards that guide law enforcement and prosecutorial officials" (internal quotation marks omitted)).

26. *See Brake*, 2004 UT 95, ¶¶ 14–15, 103 P.3d 699.

27. *See Pena*, 869 P.2d at 937–38 (citing Maurice Rosenberg, *Judicial Discretion of the Trial Court, Viewed From Above*, 22 Syracuse L.Rev. 635, 662–63 (1971)); *Brake*, 2004 UT 95, ¶ 14, 103 P.3d 699.

pastures of different sizes.[28] When a trial court stays within the pasture associated with a specific legal concept, it is free "to reach one of several possible conclusions about the legal effect of a particular set of facts without risking reversal."[29] Discretion is broadest—and the standard of review is most deferential—when the application of a legal concept is highly fact dependant and variable.[30] Discretion is most confined—and the standard of review is nondeferential—when the legal concept is easily defined by appellate courts or when appellate courts erect strict fences for policy reasons.[31]

*B. The Test We Employ in Determining the Standard of Review for Mixed Questions Balances Policy Considerations Related to Courts' Institutional Competencies*

¶ 25 In *Pena* and its progeny, we have articulated four factors to guide Utah appellate courts in the difficult task of selecting the appropriate standard of review for a mixed question of fact and law from the spectrum of possible levels of deference to a trial court. Most recently, we discussed these factors in *State v. Virgin.*[32] However, this four-factor test has continued to cause some confusion. As will be explained, we therefore take this occasion to refine the test by eliminating a factor that has proven to be unhelpful and rephrasing the others to better reflect the purpose of the test. Our revised test considers the following factors: (1) the degree of variety and complexity in the facts to which the legal rule is to be applied; (2) the degree to which a trial court's application

of the legal rule relies on "facts" observed by the trial judge, "such as a witness's appearance and demeanor, relevant to the application of the law that cannot be adequately reflected in the record available to appellate courts;" and (3) other "policy reasons that weigh for or against granting discretion to trial courts."[33]

¶ 26 As to the first factor, the greater the complexity and variety of the facts, the stronger the case for appellate deference. As to the second, the greater the importance of a trial court's credibility assessments that cannot be adequately reflected in the record, the stronger the case for appellate deference. The third factor requires that we take into consideration policy factors related to the degree of deference that should be applied. Even where a case for appellate deference is strong under the first two factors, policy considerations may nevertheless lead us to limit that deference.[34]

¶ 27 While the above balancing test reflects the principles relied upon in our opinions in *Pena* and its progeny and does not significantly depart from our prior statements regarding mixed questions of fact and law, we have rephrased the language of the factors and have eliminated the second *Pena* factor—the novelty of the situation. We have made these revisions to enhance the analytical consistency and clarity of the balancing test to be applied in placing different mixed questions along the spectrum of deference and discretion.

¶ 28 As the first three factors for determining the standard of review have been

---

28. *See Pena,* 869 P.2d at 937–38.

29. *Virgin,* 2006 UT 29, ¶ 27, 137 P.3d 787 (quoting *Pena,* 869 P.2d at 937).

30. *See Pena,* 869 P.2d at 938–40.

31. *See Brake,* 2004 UT 95, ¶ 14, 103 P.3d 699 ("Considerations of policy play a central part in the placement of discretionary fences.")

32. 2006 UT 29, ¶ 28, 137 P.3d 787 ("[W]e quantify [a trial court's] discretion by weighing the following factors: (1) whether the facts to which the legal rule is to be applied are so complex and varying that no rule adequately addressing the relevance of all these facts can be spelled out; (2)

whether the situation to which the legal principle is to be applied is sufficiently new to the courts that appellate judges are unable to anticipate and articulate definitively what factors should be outcome determinative; (3) whether the trial judge has observed 'facts,' such as a witness's appearance and demeanor, relevant to the application of the law that cannot be adequately reflected in the record available to appellate courts; and (4) whether there are policy reasons that weigh for or against granting discretion to trial courts, such as when substantial constitutional rights are implicated." (citations and internal quotation marks omitted)).

33. *Id.*

34. *See Brake,* 2004 UT 95, ¶ 14, 103 P.3d 699.

phrased in *Pena* and its progeny, their application suggested only "yes" or "no" answers,[35] making the factors ill-suited to use in a balancing test. Further, by quoting these first three *Pena* factors verbatim in the process of transforming them into a balancing test, we have in many of our earlier statements of the balancing test overemphasized their importance and artificially divorced them from our central concern with the policy implications of selecting a more-deferential or less-deferential standard of review.[36] In contrast, we have recently reaffirmed the centrality of policy considerations in our decision in Brake [37] and treated policy considerations as a "fourth" *Pena* factor in *State v. Virgin.*[38] Thus, to clarify the appropriate test, we have rephrased the factors here in a manner that better reflects their usefulness in selecting a standard of review from somewhere along the spectrum of deference.

¶ 29 In the process of rephrasing the test, we have dropped the "novelty" factor because it has rarely, if ever, proven to be helpful to our analysis. As it was phrased in *Pena*, the novelty factor considered whether "the situation to which the legal principle is to be applied is sufficiently new to the courts that appellate judges are unable to anticipate and articulate definitively what factors should be outcome determinative." [39] The

situations in which this factor required more deferential review were unclear. Our cases demonstrate that legal issues involving situations that are completely new to the appellate courts are rare. Furthermore, where a situation is novel, it is not self-evident that the appellate courts should restrain themselves from exercising searching review and should instead take a wait-and-see approach to establishing a legal test. In the language of the pasture metaphor, we are not convinced that we should necessarily refrain from establishing fences that restrain trial courts simply because a situation is novel and anticipating the future development of the law may be difficult.

¶ 30 Furthermore, because this "novelty" factor was prominent in the original *Pena* test despite its rare applicability, it has often proven unwieldy, cluttered the analysis, or been ignored. For example, we have sometimes stated that the situation presented was not "new," but then have addressed whether we could articulate "outcome determinative factors." [40] The later inquiry is substantially the same as the inquiry that we make under the first factor, namely: the degree to which the variety and complexity of the facts make it difficult to articulate a legal test or factors that are outcome determinative. Such mixing of the separate analytical inquiries from the first and second original *Pena* factors has

---

35. *See Pena*, 869 P.2d at 939 (listing three circumstances in which the trial court should be given discretion, namely: "(i) when the facts to which the legal rule is to be applied are so complex and varying that no rule adequately addressing the relevance of all these facts can be spelled out; (ii) when the situation to which the legal principle is to be applied is sufficiently new to the courts that appellate judges are unable to anticipate and articulate definitively what factors should be outcome determinative; and (iii) when the trial judge has observed 'facts,' such as a witness's appearance and demeanor, relevant to the application of the law that cannot be adequately reflected in the record available to appellate courts" (quoting Rosenberg, *supra* note 27, at 662–63)).

36. See, *e.g., Desert Miriah, Inc. v. B & L Auto, Inc.*, 2000 UT 83, ¶¶ 10, 12, 12 P.3d 580 (quoting and applying the original three *Pena* factors and then mentioning in a later paragraph that there are "no policy reasons outweighing" the first three factors suggesting a deferential standard).

37. 2004 UT 95, ¶¶ 14–15, 103 P.3d 699.

38. 2006 UT 29, ¶ 28, 137 P.3d 787.

39. 869 P.2d at 939.

40. *See Searle v. Milburn Irr. Co.*, 2006 UT 16, ¶ 17, 133 P.3d 382 (concluding that "at least some deference should be granted to the district court's application of the law to the facts" where it was "exceedingly difficult to craft a uniform rule neatly applicable in all situations"); *Butler, Crockett & Walsh Dev. Corp. v. Pinecrest Pipeline Operating*, 2004 UT 67, ¶ 47, 98 P.3d 1 (concluding that the second factor supported additional deference to a trial court's beneficial use determination, even though the beneficial use doctrine "has roots dating back to the turn of the last century"); *Jeffs v. Stubbs*, 970 P.2d 1234, 1245 (Utah 1998) (concluding that although "the unjust enrichment doctrine has ancient roots," the second factor supported a "broad degree of discretion in applying the law" where "the court's ability to state clearly the outcome-determinative factors remains elusive").

only served to confuse the analysis and may have led appellate courts to place too much weight on the difficulty of articulating a rule. Ultimately, in the rare instances where this "novelty of the situation" factor may be important, it could fall under the umbrella of other policy considerations.

¶ 31 In making these changes to the way that we articulate the established standard, our intent is to improve upon our statement of the test that we apply to mixed questions of fact and law without changing its core substance. As before, our goal in applying the above balancing test is to allocate tasks between the trial and appellate courts based on their institutional roles and competencies.

## II. WHETHER A DEFENDANT WAS SUBJECTED TO CUSTODIAL INTERROGATION IS A MIXED QUESTION OF FACT AND LAW THAT WE REVIEW FOR CORRECTNESS.

¶ 32 Having set forth the balancing test to be used in selecting an appropriate standard of review for a mixed question of fact and law, we now apply the test to answer the question at hand; namely, what is the standard appellate courts apply in reviewing a trial court's determination that a person was or was not subjected to custodial interrogation for the purpose of Fifth Amendment *Miranda* protections? To do so, we will first outline the legal concept of custodial interrogation in the context of our Fifth Amendment jurisprudence. We will then apply the three-factor balancing test to the mixed question of custodial interrogation, discussing each of the three factors in turn.

### A. The Legal Concept of Custodial Interrogation

■ ¶ 33 To apply the three-factor mixed question test set forth above, we must first understand the legal concept of custodial interrogation, which trial courts apply to the facts of each case. The Fifth Amendment to the United States Constitution guarantees that a person shall not be "compelled in any criminal case to be a witness against himself." We protect this right by excluding from a defendant's criminal trial any incriminating statement that the defendant made to police officers while under custodial interrogation if the officers did not give a *Miranda* warning.[41]

■ ¶ 34 Generally, custodial interrogation consists of questioning or use of other techniques of persuasion " 'initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way.' "[42] Thus, custodial interrogation occurs where there is both (1) custody or other significant deprivation of a suspect's freedom and (2) interrogation. These two elements are interrelated.

■ ¶ 35 We often describe the first element as an inquiry into whether a suspect was "in custody." A person is in custody when "[the person's] freedom of action is curtailed to a degree associated with formal arrest."[43] The inquiry is objective and considers "how a reasonable man in the suspect's position would have understood his situation."[44] A suspect may understand himself or herself to be in custody based either on physical evidence or on the nature of the officer's instructions and questions. Therefore, we focus on both the evidence of restraint and on objective evidence of the officers' intentions.[45] As stated by the U.S. Supreme Court,

**41.** *Rhode Island v. Innis,* 446 U.S. 291, 297, 300–01, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980); *Miranda v. Arizona,* 384 U.S. 436, 444–45, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

**42.** *Innis,* 446 U.S. at 298–99, 100 S.Ct. 1682 (quoting *Miranda v. Arizona,* 384 U.S. 436, 444, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966)); *accord Stansbury v. California,* 511 U.S. 318, 323, 114 S.Ct. 1526, 128 L.Ed.2d 293 (1994).

**43.** *Berkemer v. McCarty,* 468 U.S. 420, 440, 104 S.Ct. 3138, 82 L.Ed.2d 317 (1984) (internal quo-

tation marks omitted); *see also State v. Mirquet,* 914 P.2d 1144, 1147 (Utah 1996).

**44.** *Stansbury,* 511 U.S. at 324, 114 S.Ct. 1526 (internal quotation marks omitted); *accord Mirquet,* 914 P.2d at 1147.

**45.** *See Berkemer,* 468 U.S. at 442, 104 S.Ct. 3138; *Salt Lake City v. Carner,* 664 P.2d 1168, 1170 (Utah 1983).

[A]n officer's views concerning the nature of an interrogation, or beliefs concerning the potential culpability of the individual being questioned, may be one among many factors that bear upon the assessment whether that individual was in custody, but only if the officer's views or beliefs were somehow manifested to the individual under interrogation and would have affected how a reasonable person in that position would perceive his or her freedom to leave.[46]

¶ 36 For instance, when investigatory questioning shifts to accusatory questioning, the existence of custody is likely because this often indicates to the defendant that he or she is not free to leave. By making accusations, the police officer indicates that there are reasonable grounds to believe that a crime has been committed and that the defendant committed it.[47] In *Salt Lake City v. Carner*,[48] we set forth four factors that aid in determining whether a defendant is "in custody" for purposes of the *Miranda* protections:[49] "(1) the site of interrogation; (2) whether the investigation focused on the accused; (3) whether the objective indicia of arrest were present; and (4) the length and form of interrogation."[50]

¶ 37 Once a trial court determines that the defendant was "in custody," it must then decide whether the incriminating statement was the product of interrogation.[51] Interrogation is "either express questioning or its functional equivalent" and it incorporates any "words or actions on the part of police officers that they *should have known*

were reasonably likely to elicit an incriminating response." [52]

## B. Application of the Balancing Test to the Mixed Question of Custodial Interrogation

¶ 38 Applying our three-factor balancing test to the legal concept of custodial interrogation, we first consider the degree of complexity and variety in the facts that are involved in custodial interrogation determinations. We have said that additional deference to the trial court is warranted where the facts "are so complex and varying that no rule adequately addressing the relevance of all these facts can be spelled out." [53]

¶ 39 We initially note that the rules defining both the custody and interrogation prongs of custodial interrogation are well defined and adequate. We set forth the four *Carner* factors for determining custody more than twenty years ago and they continue to guide us today. Furthermore, in light of the objective nature of both prongs of the custodial interrogation test, the relevant facts are typically not particularly complex and can usually be identified with specificity. The location of the interrogation usually can be found in the record, and the significance of the location is often intuitive. Places that are confined or isolated are more likely to indicate custody than those that are public and open.[54] The length of the interrogation can usually be closely approximated and compared with the length of ordinary investigative detentions. As for indicia of arrest, we generally look to whether handcuffs, drawn

**46.** *Stansbury,* 511 U.S. at 325, 114 S.Ct. 1526.

**47.** *See Mirquet,* 914 P.2d at 1148 (indicating that accusatory questioning is relevant, but does not necessarily establish a coercive environment); *Carner,* 664 P.2d at 1170 (recognizing import of accusatory statements); *State v. Snyder,* 860 P.2d 351, 357 (Utah Ct.App.1993)(same).

**48.** 664 P.2d 1168 (Utah 1983).

**49.** *See Mirquet,* 914 P.2d at 1147 n. 2 (explaining that although *Carner* was decided under Article I, section 12 of the Utah Constitution, the same test applies under the Fifth Amendment of the United States Constitution).

**50.** *Carner,* 664 P.2d at 1171.

**51.** *Rhode Island v. Innis,* 446 U.S. 291, 298–301, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980).

**52.** *Id.* at 300–02, 100 S.Ct. 1682.

**53.** *Pena,* 869 P.2d at 939.

**54.** *Compare Mirquet,* 914 P.2d at 1148 (noting that one factor indicating custody was location of questioning inside the confines of the front seat of a police car) *with Berkemer v. McCarty,* 468 U.S. 420, 438, 104 S.Ct. 3138, 82 L.Ed.2d 317 (1984) (suggesting that because the typical traffic stop is conducted where passersby may witness the interaction, a motorist does not feel completely at the mercy of the police).

guns, locked doors, threats, or coercion are present.[55] The question of whether the defendant was a "focus" of the investigation depends on whether the investigators' actions indicated that they had identified the defendant as a likely criminal culprit. Finally, the facts that are relevant to the objective legal question of whether the police officers should have known that their words or actions were likely to elicit an incriminating response consist of the words or actions themselves, their meaning, and their likely impact. In sum, although the facts relating to custodial interrogation will vary from case to case, this first factor of the balancing test weighs against appellate deference because such facts typically are not "so complex and varying that no rule adequately addressing the relevance of all these facts can be spelled out." [56]

¶ 40 Second, we consider the degree to which the application of the legal rule relies on "facts" observed by the trial judge—such as a witness's appearance and demeanor—that cannot be adequately reflected in the record available to appellate courts. The greater the significance of these types of facts, the greater the case for appellate deference. Although the trial court's superior position to make credibility determinations can be important with respect to custodial interrogations, given the objective nature of the test to be applied, it is typically less important than in other contexts. The necessary facts regarding the site, length, and focus of the interrogation and the indicia of arrest are facts that generally can be adequately reflected in a cold record. Similarly, facts that show that a police officer's statement or act is one that the officer should have known would likely elicit an incriminating response generally can be identified with specificity and written into the record. Thus, this second factor of the balancing test does not weigh in favor of granting greater discretion to the trial court.

¶ 41 Third, and lastly, we consider whether policy considerations favor more or less appellate control over the factual application of the concept of custodial interrogation.[57] Because the custodial interrogation inquiry is the crux of the test that determines when a suspect's Fifth Amendment right must be protected through a *Miranda* warning, there is a strong interest in promoting clarity and consistency in our state's jurisprudence. Clarity and consistency in our courts' application of the *Miranda* protections will benefit the accused by offering predictable constitutional protections, and it will benefit the State by providing better guidance to the police officers in their administration of *Miranda* warnings. Thus, the third factor in our balancing test weighs strongly in favor of nondeferential review.

¶ 42 Our application of the balancing test leads us to conclude that nondeferential appellate review of custodial interrogation determinations is mandated. Specifically, we hold that the first two factors of the balancing test do not favor deferential review because the facts involved in a custodial interrogation determination are usually relatively simple, and the custodial interrogation determination does not typically rely heavily on credibility determinations or other subtle factual determinations that are the prerogative of the trial court. Moreover, even if the application of these factors made a stronger case for deferential appellate review, they would be outweighed by the need for uniformity in the custodial interrogation standard.

¶ 43 Our reasoning on these points is consistent with that from our recent decision in *State v. Brake.*[58] In *Brake*, we decided that we would review for correctness mixed questions of fact and law in the context of Fourth Amendment search and seizure cases.[59] We grounded this decision in the substantial constitutional issues at stake, determining that the variety of fact patterns in those search

---

55. *See State v. Wood,* 868 P.2d 70, 83 (Utah 1993); *Carner,* 664 P.2d at 1171.

56. *See Pena,* 869 P.2d at 939.

57. *State v. Virgin,* 2006 UT 29, ¶ 28, 137 P.3d 787 (citing *Pena,* 869 P.2d at 938–39).

58. 2004 UT 95, ¶¶ 14–15, 103 P.3d 699.

59. *Id.*

and seizure cases was not unmanageable and did not outweigh the need for uniform legal rules.[60] We concluded that, in the context of Fourth Amendment search and seizure cases, the need for a consistent body of case law that would set statewide standards demanded that we review each of these determinations for correctness.[61]

¶ 44 Like the law governing Fourth Amendment protections, custodial interrogation determinations define the boundaries of a substantial constitutional right—the Fifth Amendment right to avoid self incrimination—and should be defined and applied uniformly for the benefit of the State as well as for the benefit of the criminal suspect. As in *Brake*, these concerns outweigh countervailing factors and require nondeferential review of this mixed question of fact and law. Indeed, the facts that we consider in the context of a Fifth Amendment custodial interrogation determination are generally simpler and more manageable than the facts that go into determining search and seizure issues under the Fourth Amendment.

¶ 45 Finally, we note that although we have not previously applied an express balancing analysis to the mixed question of custodial interrogation, our announcement of a correctness standard of review for custodial interrogation determinations is consistent with our prior precedent. Since we directly addressed standards of review for mixed questions in *Pena*, this court has discussed the standard of review for the mixed question of custodial interrogation in only one case, *State v. Wood*.[62] In *Wood*, we stated that when facts are undisputed we review custodial determinations for correctness.[63]

While our correctness standard does conflict with the deferential standard applied in some of our court of appeals' cases,[64] that court has never expressly considered the policy implications discussed in *Brake* or conducted a full balancing analysis using the factors that we discussed in *Pena* and its progeny. In sum, our application of the balancing test to the mixed question of custodial interrogation, particularly in light of the policy favoring uniformity in the application of Fifth Amendment *Miranda* protections, leads us to conclude that we should apply a correctness standard for such questions.

## CONCLUSION

¶ 46 We hold that custodial interrogation determinations should be reviewed for correctness. We arrive at this conclusion by applying a revised three-factor balancing test that is based on the factors and policy considerations discussed in *State v. Pena* and its progeny. First, the facts attendant to custodial interrogation determinations are generally not so complex and varied as to preclude the articulation of a rule. Second, credibility determinations generally do not weigh heavily in such determinations. And third, there is a strong policy interest in establishing predictable standards to guide both the courts and police officers in their administration of Fifth Amendment *Miranda* protections. Having answered the question that is before us on certiorari, we remand to the court of appeals with directions to apply a correctness standard to the trial court's determination that Levin was not subjected to custodial interrogation and for further proceedings consistent with this opinion.

---

**60.** *Id.*

**61.** *Id.; see also State v. Hansen*, 2002 UT 125, ¶ 25, 63 P.3d 650; *State v. Warren*, 2003 UT 36, ¶ 12, 78 P.3d 590.

**62.** 868 P.2d 70 (Utah 1993).

**63.** *Id.* at 83.

**64.** *See State v. Teuscher*, 883 P.2d 922, 929 (Utah Ct.App.1994) (determining that a trial court's custody determination should be granted some deference because the inquiry is fact-sensitive);

*see also State v. Riggs*, 1999 UT App 271, ¶ 7, 987 P.2d 1281 (granting a measure of discretion to trial court's custodial interrogation determination); *State v. Strausberg*, 895 P.2d 831, 834 n. 5 (Utah Ct.App.1995) (granting a measure of discretion to trial court's custody determination "unless such determination exceeds established legal boundaries"). *But see State v. Brandley*, 972 P.2d 78, 81 (Utah Ct.App.1998) (reviewing for correctness whether, given the underlying facts, defendant "was in custody for *Miranda* purposes").

¶ 47 Chief Justice DURHAM, Associate Chief Justice WILKINS, Justice PARRISH, and Justice NEHRING concur in Justice DURRANT's opinion.