Kevin R. JOHNSON, Petitioner,

v.

DEPARTMENT OF EMPLOYMENT SECURITY and Morton Thiokol, Inc., Respondents.

No. 880703–CA.

Court of Appeals of Utah.

Nov. 8, 1989.

David Bert Havas and John Cummings, Ogden, for petitioner.

Lorin R. Blauer and Winston M. Faux, Salt Lake City, for respondent Dept. of Employment Security.

Richard K. Shimabukuro, Brigham City, Janet Hugie Smith and Paul D. Newman, Salt Lake City, for respondent Morton Thiokol, Inc.

George M. Haley and Richard G. Hackwell, Salt Lake City, for amicus curiae American Civ. Liberties Union.

## OPINION

Before GARFF, GREENWOOD and ORME, JJ.

GARFF, Judge:

Petitioner Kevin R. Johnson seeks review of his denial of unemployment benefits by the Board of Review of the Industrial Commission (Board). We affirm.

On September 21, 1987, Johnson, an employee of respondent Morton Thiokol, Inc., was driving a company vehicle when he was involved in an accident.

Morton Thiokol had a written drug policy, of which Johnson was aware, that required drug testing of any employee involved in an automobile accident. Under this policy, a test showing twenty or more nanograms per milliliter of marijuana metabolites was considered positive, and im-mediate termination could result from testing positive. Pursuant to this policy, Johnson was tested on September 21, 1987. He tested positive at 128 nanograms. As a result, Morton Thiokol imposed upon Johnson a three-day disciplinary suspension, counseling, and twelve months of probation during which he was informed that he might be subjected to random drug testing.

Johnson was again tested on November 25, 1987, sixty-five days later. This time, the test showed twenty-five nanograms of marijuana. Consequently, Morton Thiokol terminated his employment on December 11, 1987.

Johnson filed a claim for unemployment benefits, effective December 20, 1987. The Department of Employment Security (Department) allowed him unemployment benefits and charged Morton Thiokol with the associated benefit costs, finding that Morton Thiokol had not introduced sufficient evidence to establish disqualifying conduct on Johnson's part.

Morton Thiokol contested Johnson's award of benefits. A hearing was held before an administrative law judge (A.L.J.) on February 11, 1988, at which both parties were represented by counsel. It was established that Johnson was an average employee who had no reprimands or other adverse information in his employee file. The sole reason Johnson had been initially tested was the accident, for which he had not been responsible. Further, there was no evidence that Johnson had consumed marijuana on company time or premises. Johnson testified that he had not used marijuana after the first test and believed that the second test had been positive because of passive inhalation from his roommates' daily smoking in their shared apartment. The A.L.J. affirmed the Department's prior decision, finding that Johnson had not been discharged for just cause.

Morton Thiokol sought review of the A.L.J.'s decision, which the Board reversed. However, because Johnson had not been appropriately notified of the appeal, the case was reopened. The Board directed that the A.L.J. hold another hearing at

which certain expert testimony could be received.

At this hearing, both parties offered expert testimony on the issue of how long marijuana metabolites remained in the body after consumption. Dr. Kerr, Morton Thiokol's medical director and drug program supervisor, testified that Morton Thiokol complied with the Utah Drug and Alcohol Testing Act, that the testing procedures followed by Morton Thiokol were designed to account for the possibility of passive inhalation as well as gradual dissipation of an illegal substance, and that only actual use of marijuana could account for Johnson's positive second test. Dr. Loveridge, an alleged expert witness called by the Board, testified that he had tested persons for marijuana who had tested positive after three months of abstinence. Both parties objected to Dr. Loveridge's qualification as an expert witness. The A.L.J. declined to rule on this objection, leaving the determination as to whether Loveridge was qualified as an expert witness to the Board. The Board found that Dr. Loveridge was not qualified as an expert on issues concerning the period of time marijuana residue remains in the human body and, therefore, disregarded his testimony, affirmed its prior decision, and denied Johnson further unemployment benefits.

Johnson brought this writ of review, raising the following issues: (1) Was the Board's decision to deny unemployment benefits to Johnson, after he tested positive for marijuana on two separate occasions in violation of Morton Thiokol's written policy, supported by sufficient evidence? (2) Does the Utah Drug and Alcohol Testing Act violate constitutional guarantees of equal protection, and was it unconstitutionally applied to Johnson?

## STANDARD OF REVIEW

This action was commenced after the effective date of the Utah Administrative Procedures Act, Utah Code Ann. §§ 63–46b–1 to 63–46–22 (1988).[1] Therefore, we review the Board's decision under the new standards set forth in the Act.

■ Whether an employee is terminated for "just cause" is a mixed question of law and fact. *Law Offices of David Paul White v. Board of Review,* 778 P.2d 21, 23 (Utah Ct.App.1989). Under the UAPA, our review of mixed questions of law and fact is governed by Utah Code Ann. § 63–46b–16(4)(d) (1989), which we have previously interpreted to embrace the standard set forth in *Utah Dep't of Admin. Servs. v. Public Serv. Comm'n,* 658 P.2d 601, 610 (Utah 1983). *See Pro–Benefit Staffing, Inc. v. Board of Review,* 775 P.2d 439, 442 (Utah Ct.App.1989). Accordingly, we will not disturb the Board's application of law to its factual findings unless its determination exceeds the bounds of reasonableness and rationality. *Id.* However, we accord less deference to the Board's factual findings than under the old law, upholding its factual findings if they are "supported by substantial evidence when viewed in light of the whole record before the court." *Grace Drilling Co. v. Board of Review,* 776 P.2d 63, 67 (Utah Ct.App. 1989) (quoting Utah Code Ann. § 63–46b–16(4)(g) (1988)); *see also USX Corp. v. Industrial Comm'n of Utah,* 781 P.2d 883, 886 (Utah Ct.App.1989). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Grace Drilling,* 776 P.2d at 68 (quoting *Idaho State Ins. Fund v. Hunnicutt,* 110 Idaho 257, 715 P.2d 927, 930 (1985)).

## SUFFICIENCY OF THE EVIDENCE

An individual is ineligible for unemployment benefits under Utah Code Ann. § 35–4–5(b)(1) (1978), when he is "discharged for just cause or for an act or

---

1. Under Utah Code Ann. § 63–46b–22(1) (1989), the UAPA is applicable only to "agency adjudicative proceedings commenced by or before an agency on or after January 1, 1988." Although Johnson applied for unemployment benefits on December 20, 1987, the hearing on Morton

Thiokol's appeal was not held until February 11, 1988. Because application for unemployment benefits is not an adjudicative procedure, while an appellate proceeding before an A.L.J. is, we deem the commencement of this action to be February 11, 1988.

omission in connection with employment, not constituting a crime, which is deliberate, willful, or wanton and adverse to the employer's rightful interest." The purpose for establishing that a person's employment has been terminated for just cause is "to deny benefits to individuals who bring about their own unemployment by conducting themselves, with respect to their employment with callousness, misbehavior, or lack of consideration to such a degree that the employer was justified in discharging the employee." Utah Admin.R.475–5b1–1 (1987–88). We recognize, however, that even though an employer may have reason to discharge an employee, "not every cause for discharge provides a basis to deny eligibility for unemployment compensation." *Champlin Petroleum Co. v. Department of Employment Sec.*, 744 P.2d 330, 333 (Utah Ct.App.1987) (quoting *Clearfield City v. Department of Employment Sec.*, 663 P.2d 440, 441 (Utah 1983)).

Johnson relies upon a three-prong test for finding a discharged employee ineligible for unemployment compensation as set forth by the Utah Supreme Court in *Clearfield City v. Department of Employment Sec.*, 663 P.2d 442–43 (Utah 1983).[2] However, section 35–4–5(b)(1) was amended to include termination for just cause as a reason for denial of benefits. Subsequently, in *Kehl v. Board of Review*, 700 P.2d 1129, 1133–34 (Utah 1985), the Utah Supreme Court adopted a somewhat different three-prong test as the pertinent test for finding that an employee was discharged for just cause.[3] Because just cause is at issue in the present case, we rely on the *Kehl* test, which requires the employer to show: (1) the employee's culpability, (2) his or her knowledge of expected conduct, and (3) that the offending conduct was within the employee's control. *Id.; see also Pro–Benefit Staffing*, 775 P.2d at 442.

## Culpability

▉ The Department's regulations governing just cause define culpability as "the seriousness of the conduct or the severity of the offense as it affects continuance of the employment relationship." Utah Admin.R.475–5b1–2.1.a (1987–88).[4] In determining the culpable nature of an employee's conduct, "[t]he wrongness of the conduct must be considered in the context of the particular employment and how it affects the employer's rights." *Id.*

Johnson asserts that he did not engage in culpable conduct and should not be denied unemployment benefits because Morton Thiokol submitted no evidence that he was impaired in performing his duties, or that he had consumed marijuana on Morton Thiokol's time or premises. He takes the position that to show just cause, Morton Thiokol must prove he was actually impaired or actually consumed marijuana on the job rather than merely showing that marijuana was present in his system.

For Johnson's acts to have been culpable, "it is sufficient that the acts were intended, the consequences were reasonably foreseeable, and that such acts have serious effect on the employee's job or the employer's interests." Utah Admin.R.475–5b1–2.3 (1987–88).

## Act is Intended

The Utah Supreme Court, in *Clearfield City*, 663 P.2d at 444, found that an employee's acts were deliberate when they were "volitional acts by an employee who could not have been heedless of their consequences." *See also Western Dairymen Coop., Inc. v. Board of Review*, 684 P.2d 647, 649 (Utah 1984). Johnson's initial act of consuming marijuana, which he admits

---

2. To establish disqualifying conduct under *Clearfield City*, the employer must show that the employee engaged in conduct which: (1) was in connection with employment, (2) was adverse to the employer's interest, and (3) for which the employee had a degree of culpability. *Clearfield City v. Department of Employment Sec.*, 663 P.2d 440, 442–43 (Utah 1983).

3. The *Kehl* test is based upon the Department's regulations which are codified in Utah Admin. R.475–5b1–1.

4. Administrative agencies have the power to create rules and regulations which conform to the authorizing statute and do not depart from it. *State v. Chindgren*, 777 P.2d 527, 529 (Utah Ct.App.1989).

to doing, was intentional under this standard. He engaged in it voluntarily and knew or should have known that he could be terminated for doing so. Although Johnson maintained that he did not voluntarily engage in further consumption of marijuana after his initial test, the Board found that the evidence did not support this assertion.[5]

Consequences are Reasonably Foreseeable and Serious Effect on Employer's Interests

The employee's "discharge must have been necessary to avoid actual or potential harm to the employer's rightful interests." Utah Admin. R.475–5b1–2.1.a (1987–88). It is undisputed that Morton Thiokol suffered no actual harm from Johnson's behavior. However, the potential harm it could incur from Johnson and other employees engaging in the consumption of illegal drugs is substantial. "All employers, both public and private have the right to expect employees to refrain from acts which are detrimental to the business or would bring dishonor on the business name or the institution." Utah Admin. R.475–5b1–7 (1987–88). Furthermore, "[c]ulpability may be established even if the result of the violation of the rule does not in and of itself cause harm to the employer, but the resultant lack of compliance with rules diminishes the employer's ability to have order and control." Utah Admin. R.475–5b1–8.-1.d (1987–88). The consumption of illegal drugs by employees is the sort of act that could not only bring dishonor upon Morton Thiokol, but also has the potential to cause a major tragedy. Even though a single act of drug consumption by an employee may not have immediate harmful results, the resultant lack of compliance could diminish the employer's ability to maintain safety, order and control, not only over the offending employee, but also over the rest of the work force.

■ Disqualifying conduct is not limited to conduct on the employer's premises during business hours, as Johnson suggests. "It is only necessary that the misconduct have such 'connection' to the employee's duties and to the employer's business that it is a subject of legitimate and significant concern to the employer." *Clearfield City,* 663 P.2d at 443; *see also* Utah Admin. R.475–5b1–7 (1987–88).

■ Maintaining a drug-free workplace is clearly one of Morton Thiokol's rightful concerns. First, all employers and employees are entitled to a drug-free workplace. This right is recognized in the Utah Drug and Alcohol Testing Act, in which the legislature stated that it

finds that a healthy and productive work force, safe working conditions free from the effects of drugs and alcohol, and maintenance of the quality of products produced and services rendered in this state, are important to employers, employees, and the general public. The Legislature further finds that the abuse of drugs and alcohol creates a variety of workplace problems, including increased injuries on the job, increased absenteeism, increased financial burden on health and benefit programs, increased workplace theft, decreased employee morale, decreased productivity, and a decline in the quality of products and services.

Utah Code Ann. § 34–38–1 (1988).

Second, and perhaps more importantly, Morton Thiokol has a particular interest in maintaining a drug-free workplace above and beyond these general concerns because it is a government contractor in the business of building highly sophisticated and sensitive national defense products. The use of illegal drugs by employees, on or off duty, could not only result in "the potential for accidents on duty and for failures that can pose a serious threat to national security, health, and safety," but could also result "in less than the complete reliability, stability, and good judgment that are consistent with access to sensitive information. Use of illegal drugs also creates the possibility of coercion, influence, and irresponsible action under pressure that may pose a serious risk to national security and health and safety." Interim Defense Department Regulations Governing Drug Free Work-

5. We address these issues at length below in the "Knowledge" and "Control" sections.

place Programs For Contractors, 53 Fed. Reg. 37,763 (1988).[6]

We hold that an employee's consumption of illegal drugs, whether on or off duty and whether or not it results in actual damage to the employer, is culpable conduct justifying the denial of unemployment benefits pursuant to Utah Code Ann. § 35–4–5(b)(1). Therefore, we find Johnson's arguments to the contrary to be without merit, and Morton Thiokol to have shown that Johnson's conduct was culpable.

## Knowledge

■■■ "The employee must have had a knowledge of the conduct which the employer expected." Utah Admin. R.475–5b1–3.1.b (1987–88). Such knowledge may be established if the employer has a pertinent written policy. *Id.* It is undisputed that Morton Thiokol's drug policy was written and available to Johnson in an employee handbook, and that Johnson was aware of it. We note that after the employee is given a warning regarding objectionable conduct, he should be given an opportunity to correct it. Subsequent violations would then establish just cause. *Id.; Law Offices of David Paul White,* 778 P.2d at 25. Here, Johnson was tested, was given counseling, was placed on probation and told that he was subject to random testing, and was again tested.[7] He was given ample notice of expected conduct and clearly knew what Morton Thiokol expected. Morton Thiokol has, therefore, established the knowledge prong of this test.

---

6. We refer to the Interim Defense Department Regulations Governing Drug Free Workplace Programs For Contractors even though they were not in effect at times material to this action. We do not rely on these regulations to show that Morton Thiokol was bound by their provisions regarding regulation of use of illegal drugs by its employees. However, the rationale is valid and is useful in explaining its legitimate reasons for concern.

7. The record indicates that after Johnson's second test but prior to receiving the results, Johnson telephoned to express his concern over a second positive test and offered an explanation as to why he might test positive, namely, that his roommates smoked marijuana and he was a victim of passive inhalation.

## Control

For conduct to be disqualifying, it "must have been within the power and capacity of the claimant to control or prevent." Utah Admin. R.475–5b1–2.1.c (1987–88).

Johnson asserts that he was not able to control his exposure to marijuana after his first test, even though he stated that he abstained from it, because of passive exposure to his roommates' marijuana smoke. However, this assertion was controverted on the record. Dr. Kerr testified that the tests administered by Morton Thiokol were designed to account for the possibility of passive inhalation, that marijuana residue did not remain in a person's body for sixty-five days at the concentration found in Johnson's second test, and that only actual use of marijuana could account for Johnson's positive second test. This testimony was rebutted by Dr. Loveridge, but the Board chose to disregard his testimony on the ground that he was not qualified as an expert on this issue.[8] The Board then found that

> [b]ased on the testimony of Dr. Kerr, the Board of Review finds the testimony of the claimant wherein he denied continued use of marijuana after the September 21, 1987 test to not be credible. The Board of Review finds that if the claimant had discontinued the use of marijuana after the September 21, 1987 test, he would have tested negative when tested again sixty-five days later on November 25, 1987.

■■■■■ We note first that the matter of the qualification of an expert witness lies

---

8. The Board's decision stated:

> The Board of Review notes that the claimant's attorney objected to Dr. Loveridge being accepted as an expert witness in this case on the grounds that Dr. Loveridge was not qualified as an analytical chemist dealing with the testing of marijuana in the human body and how long marijuana residue remains in the human body. After carefully considering Dr. Loveridge's answers to Mr. Havas' questions regarding his experience and expertise with respect to marijuana testing, the Board of Review sustains Mr. Havas' objections and therefore disregards Dr. Loveridge's testimony in this matter.

in the discretion of the trier of fact. *See State v. Eldredge*, 773 P.2d 29, 36–37 (Utah 1989); *Hardy v. Hardy*, 776 P.2d 917, 925 (Utah Ct.App.1989).[9] Consequently, the Board had the discretion to determine that Dr. Loveridge was not qualified as an expert witness and to exclude his testimony from consideration, especially since the A.L.J. specifically deferred to the Board on the qualification question.

■ Second, there is substantial evidence on the record, despite Dr. Loveridge's testimony, to support the Board's determination. Under our standard of review, we will sustain the Board's factual findings if they are "supported by substantial evidence when viewed in the light of the whole record before the court." *Grace Drilling Co.*, 776 P.2d at 67 (quoting Utah Code Ann. § 63–46b–16(4)(g) (1988)). Therefore, we sustain the Board's finding that Johnson consumed marijuana after his first test. Because Johnson has control over his personal consumption of illegal drugs, we find that Morton Thiokol has also established the element of control.

■ Because Morton Thiokol has established all three of the required prongs, we hold that Johnson was terminated for just cause and affirm the Board's denial of unemployment benefits to him. "If an employee violates reasonable rules of the employer and the three elements of culpability, knowledge and control are established, benefits must be denied." Utah Admin. R.475–5b1–8.1 (1987–88).

## EQUAL PROTECTION

■ Johnson asserts that the Utah Drug and Alcohol Testing Act, Utah Code Ann. §§ 34–38–1 to 34–38–15 (1988), violates constitutional guarantees of equal protection, and that the Act was unconstitutionally applied to him. We decline to address this issue. Johnson raised this issue for the first time on appeal. We do not consider issues raised for the first time on appeal. *Rekward v. Industrial Comm'n*, 755 P.2d 166, 168 (Utah Ct.App.1988). This general rule applies to constitutional issues first raised on appeal as well as to other issues, unless a person's liberty is at stake. *Pratt v. City Council of the City of Riverton*, 639 P.2d 172, 173–74 (Utah 1981); *see Pease v. Industrial Comm'n*, 694 P.2d 613, 616 (Utah 1984) (petitioner has the responsibility to raise all issues that could be presented at the time, including constitutional issues, for the issues to be presented for appeal).

Affirmed.

GREENWOOD, J., concurs.

ORME, Judge (concurring):

I fully concur in the court's opinion. I write separately only to highlight three factors which I regard as pivotal to our decision in this case and which may well distinguish other cases with some surface similarities from this one.

First, the employer in this case is involved in activities of such an important and sensitive nature that it is entitled to insist, in an aggressive and uncompromising way, on an absolutely drug-free work*force* and not merely a drug-free work*place*. While other industries share that trait, many do not. A degree of employer and public confidence is needed, with respect to an environment where rocket motors are being assembled, that simply does not exist in an environment where hamburgers are being assembled.

Second, the drug test which precipitated the employee's termination in this case was not really random. Rather, the test was performed on an employee with a demonstrated history of drug use, a history which was discovered in the course of a prior drug test administered for a specific, focused purpose, namely involvement in an accident while driving a company vehicle, and pursuant to announced policy. More-

---

9. Because an agency adjudicative proceeding conducted pursuant to Utah Code Ann. § 63–46b–8 (1989) deals with the taking of evidence and the rendering of a decision based upon the evidence taken, even though evidentia-

ry rules are somewhat relaxed, the agency trier of fact has the same discretion as a trial judge in determining the credibility of evidence and the qualification of expert witnesses.

over, the initial drug test by itself was not considered sufficient grounds for termination. Rather, the employee was given counselling and a probationary "second chance." His susceptibility to follow-up testing was for a finite period of time reasonable in duration under the circumstances, i.e., one year.

Finally, substantial evidence of record, including expert testimony, supports the conclusions that 1) the particular testing methodology is beyond reproach and 2) the test results establish not merely the presence of an illicit substance in the system but rather use of that substance during, and contrary to the terms of, the employee's probation.

In my view, if any of these three factors were not present, the employer's discharge of the employee would not be with sufficient "good cause" to deprive the employee of unemployment benefits.