**2014 UT App 281**

# THE UTAH COURT OF APPEALS

KIM R. BREHM,
Petitioner,
*v.*
DEPARTMENT OF WORKFORCE SERVICES AND STATE OF UTAH,
Respondents.

Opinion
No. 20130947-CA
Filed November 28, 2014

Original Proceeding in this Court

Lauren I. Scholnick and Rachel E. Otto, Attorneys
for Petitioner

Suzan Pixton, Attorney for Respondent
Department of Workforce Services

SENIOR JUDGE PAMELA T. GREENWOOD authored this Opinion, in
which JUDGES GREGORY K. ORME and J. FREDERIC VOROS JR.
concurred.[1]

GREENWOOD, Senior Judge:

¶1     Kim R. Brehm petitions for judicial review of the Workforce
Appeals Board's (the Board) decision to deny her claim for
unemployment benefits. We do not disturb the Board's decision.

## BACKGROUND

¶2     Petitioner was employed by the judicial branch of the State
of Utah (Employer) from July 3, 1995, through June 11, 2013. Prior

---

1. The Honorable Pamela T. Greenwood, Senior Judge, sat by
special assignment as authorized by law. *See generally* Utah R. Jud.
Admin. 11-201(6).

to her termination, she worked as a Senior Probation Officer in the Third District Juvenile Court, where she had access to the court's juvenile tracking database referred to as "CARE." This database is used by authorized court personnel to access a variety of information, including demographics, calendars, incident reports, e-citations, case relationships, assignments, related people in incidents, case dispositions, general accounting, case notes, orders, minutes, documents, critical messages, social summaries, substance abuse evaluations, and petitions. Most of the information stored in CARE is not accessible by the public; however, the juvenile courts allow access to some of these records via a different database called "MyCase," which includes a special section that is accessible by a juvenile's parents.

¶3     On May 24, 2013, Petitioner met with her supervisors to discuss her use of the CARE database. In that meeting, she was asked to explain why she had used CARE to repeatedly access two of her children's case files,[2] the case file of one of her children's co-defendants, the files of cases assigned to another probation officer, and the files of six other supervisors.[3] The meeting culminated in a formal request for a written explanation from Petitioner regarding her access of these files.

¶4     Petitioner provided her explanation in a letter dated May 29, 2013. In that letter, Petitioner admitted that she had used CARE to access her children's case files. She explained that she had done so in order to make sure that their fines were paid, that one of her children's fines had been reduced because of good grades, and that the children had not missed any hearings. She also admitted to

---

2. Petitioner's children had apparently been the subjects of juvenile delinquency cases in the juvenile court system.

3. Although somewhat confusing, the record refers to two sets of supervisors: Petitioner's supervisors and supervisors who were co-workers of Petitioner. Consistent with the record, our opinion refers to both sets of supervisors, and we will attempt to preserve the distinction between the two sets as clearly as possible.

accessing the case files of the other probation officer in order to "find out what the typical consequence was for someone who had committed a shoplifting offense" like her child.

¶5     She then admitted that she had also accessed the file of one of her children's co-defendants, explaining that she had done so at the request of the co-defendant's father, who was an acquaintance of hers. According to Petitioner, the father believed that a warrant had been issued for his son's arrest, which prompted him to approach her for advice about what to do. Petitioner asserted that she advised the father to contact his son's probation officer and that she gave him the officer's contact information.

¶6     Finally, Petitioner also admitted that she had accessed the case files of six co-workers because she wanted to discover whether her supervisor was treating her differently from the other supervisors. Specifically, Petitioner suspected that her supervisor was giving her extra work and requiring her to perform additional tasks in retaliation for her taking leave under the federal Family and Medical Leave Act. *See* 29 U.S.C. §§ 2601 to 2654 (2012). Accordingly, she accessed the case files of her co-workers in order to discover whether their work assignments were the same as hers. Throughout her letter, Petitioner argued that she was unaware of any policy or rule that prevented this sort of access and that such access was commonplace among probation officers. Nevertheless, she also admitted, "I already know your response to the majority of this letter, you are going to say that each individual [probation officer] has a right to privacy and I respect that . . . ."

¶7     After reviewing Petitioner's explanation, Employer issued a written termination notice dated June 11, 2013. In that notice, Employer gave a detailed account of Petitioner's use of the CARE database, as well as a number of reasons why it had concluded that termination was appropriate. The notice stated that, according to Employer's information and technology department, Petitioner accessed her children's case files on ten different occasions between March 28, 2013, and May 10, 2013. And although Petitioner had claimed that she was merely looking up fines and court dates, the access history indicated that she had also viewed other information

in her children's files, including "demographics, calendars, incidents, . . . reports, e-citations, case relationships, assignments, calendar, calendar event list, related people in incidents, case dispositions, general accounting, order account summary, notes, orders, documents, critical messages, assessments, and PI letters."

¶8    Petitioner's access history of her child's co-defendant's file also differed from her explanation. Although Petitioner claimed that she had merely provided the co-defendant's father with the contact information of the co-defendant's probation officer, her access history revealed that she had accessed the file on four different occasions and had viewed "incidents, demographics, orders, minutes, accounting, a substance abuse evaluation, social summaries, court reports, petitions, and case notes." Employer further indicated that Petitioner's access history made it clear that she had also accessed the files of the other probation officer and six other supervisors.

¶9    Employer concluded that Petitioner's access of these files was not "for the purposes for which they were intended" and that she "had no legitimate business reason to access the information contained in these cases." Employer then concluded that Petitioner's access of these files violated various statutes, rules, and policies, including Utah's Government Records Access and Management Act (GRAMA), *see* Utah Code Ann. §§ 63G-2-101 to -901 (LexisNexis 2011 & Supp. 2013), the Public Officers' and Employees' Ethics Act, *id.* §§ 67-16-1 to -15, the Utah Rules of Judicial Administration, and the policies contained in both Employer's Human Resources and Probation Officer Policy manuals. After explaining each violation, Employer concluded that "nothing in [Petitioner's] justification . . . overcomes the enormous weight of guidance from Statute, Rule and Policy prohibiting employees from using personal information of others, obtained by systems [under an employee's] control for purposes other than they were intended." Accordingly, Employer terminated Petitioner's employment.

¶10    After her discharge, Petitioner applied for unemployment benefits. The Department of Workforce Services (DWS) denied her

claim, concluding that "she knew or should have known looking up this information was wrong." Petitioner appealed DWS's decision, and a hearing was held before an administrative law judge (the ALJ). Employer did not participate at the hearing, but the ALJ did take sworn testimony from Petitioner. In her decision, the ALJ concluded that Petitioner's testimony that she was not aware that she was violating any rule or policy was not credible, because "Employer prohibits accessing computer files for non-business purposes." The ALJ further concluded that "Employer risks liability and public trust if employees access computer records for personal reasons. The [public] expects government and court records to be kept confidential." Additionally, the ALJ observed that Petitioner "knew or should have known that accessing computer records without a legitimate business purpose or authorization was prohibited," because "[i]t is . . . universal knowledge among government employees that accessing records for personal or non-business purposes is prohibited." Accordingly, the ALJ affirmed DWS's denial of benefits.

¶11   Petitioner then appealed the ALJ's decision to the Board, which affirmed the ALJ's decision. The Board agreed with the ALJ's determination that "it is not credible that [Petitioner] did not know she could not access the files or cases of her coworkers and supervisors," because "it is inconceivable that any state employee would not know that state employees cannot access private records unless there is a legitimate business purpose for doing so." The Board further determined that "this was not an isolated incident" and that the potential harm to Employer was "so egregious as to warrant immediate discharge," despite Petitioner's long work history. Petitioner now asks us to review the Board's decision.

ISSUE AND STANDARD OF REVIEW

¶12   The central issue in this case is whether the Board acted properly when it determined that Petitioner was ineligible for unemployment benefits because Employer had just cause for discharging her. "Whether an employee is terminated for just cause is a mixed question of law and fact." *Southeastern Utah Ass'n of Local*

*Gov'ts v. Workforce Appeals Bd.*, 2007 UT App 20, ¶ 6, 155 P.3d 932 (citation and internal quotation marks omitted). Nevertheless, "[d]ue to the fact-intensive inquiry involved at the agency level," cases involving unemployment benefits do "not lend [themselves] to consistent resolution by a uniform body of appellate precedent." *Carbon County v. Workforce Appeals Bd.*, 2013 UT 41, ¶ 7, 308 P.3d 477. Therefore, these cases are more "fact-like" than "law-like," *see id.*; *In re adoption of Baby B.*, 2012 UT 35, ¶ 42, 308 P.3d 382 (explaining this distinction in cases dealing with mixed questions of law and fact), and the Board's decision to award or deny unemployment benefits is entitled to deference, *see Carbon County*, 2013 UT 41, ¶ 7. Accordingly, within the context of unemployment benefits, "we will not disturb the Board's application of law to its factual findings unless its determination exceeds the bounds of reasonableness and rationality." *Johnson v. Department of Emp't Sec.*, 782 P.2d 965, 968 (Utah Ct. App. 1989).

ANALYSIS

¶13     Petitioner argues that because she did not violate any of the statutes, rules, or policies cited by Employer and because she did not violate a reasonable employment rule or a universal standard of conduct, the Board wrongly denied her claim for unemployment benefits. In the alternative, she argues that even if she did violate any of those rules or standards, Employer failed to show that she did so knowingly or with the degree of culpability required by Utah law. For the reasons stated below, we reject these arguments and uphold the Board's denial of unemployment benefits.

 I. The Standard for Denying Unemployment Benefits Under the Utah Administrative Code Differs from Petitioner's Description.

¶14     Petitioner asserts that because Employer did not meet the requirements of rule R994-405-208(1) of the Utah Administrative Code, the Board erred in denying her unemployment claim. That section provides that "[i]f a claimant violates a reasonable employment rule *and* just cause is established, benefits will be denied." Utah Admin. Code R994-405-208(1) (emphasis added).

Petitioner argues that her unemployment claim should have been granted because Employer failed to prove a violation of a "reasonable employment rule." We disagree.

¶15 Petitioner's reliance on rule R994-405-208(1) is misplaced. As its caption indicates, rule R994-405-208 merely provides "examples of reasons for discharge." *Id*. It does not, however, describe the only reasons for a "discharge." In fact, rule R994-405-208 expressly incorporates other sections of the rule—namely, sections 201 and 202—when it states, "In the following examples, the basic elements of just cause *must* be considered in determining eligibility for benefits." *Id*. (emphasis added). Accordingly, we look to sections 201 and 202 of rule R994-405—not section 208—in order to understand what an employer is required to show before a claim for unemployment benefits can be properly denied. *See id*. R994-405-203 (stating that an employer bears the burden of proving just cause).

¶16 Our case law is in accord with this approach in determining whether unemployment benefits are warranted. Our cases have consistently looked to sections 201 and 202 of rule R994-405 to determine what an employer must prove before DWS is justified in denying a claim for unemployment benefits. *See, e.g., Spencer Law Office, LLC v. Department of Workforce Servs.*, 2013 UT App 138, ¶ 4, 302 P.3d 1257; *Peyton v. Department of Workforce Servs.*, 2013 UT App 130, ¶ 3, 302 P.3d 1255; *Dinger v. Department of Workforce Servs.*, 2013 UT App 59, ¶ 15, 300 P.3d 313; *Nicol v. Department of Workforce Servs.*, 2012 UT App 360, ¶ 3, 293 P.3d 1101; *Provo City v. Department of Workforce Servs.*, 2012 UT App 228, ¶ 6, 286 P.3d 936. We are unaware of—and Petitioner does not provide a citation to—any Utah case where the standard for denying unemployment benefits was derived directly from rule R994-405-208. Accordingly, we analyze this case under the standards set forth in sections 201 and 202, not section 208.

¶17 Under rule R994-405-201, in order to properly deny unemployment benefits, the claimant must have been discharged for "just cause." *See* Utah Admin. Code R994-405-201; *see also*

*Spencer Law Office*, 2013 UT App 138, ¶ 4. To show "just cause," the employer must prove three elements: culpability, knowledge, and control. Utah Admin. Code R994-405-202 (setting forth definitions of culpability, knowledge, and control); *id.* R994-405-203 (placing burden of proof on the employer); *see also Spencer Law Office*, 2013 UT App 138, ¶ 4.

¶18    Given the foregoing, Petitioner's argument that it was necessary for the Board to first determine whether she had violated a specific statute, rule, policy, or universal standard of conduct before denying her claim for unemployment benefits is mistaken. Under sections 201 and 202 of rule R994-405, the Board's task was to assess whether there was "just cause" for Petitioner's discharge, which entailed determining whether Employer had shown culpability, knowledge, and control. The majority of the Board concluded that each of these elements had been adequately shown and, consequently, denied Petitioner's claim. We therefore do not focus on Petitioner's arguments about specific violations but instead review the Board's assessment of each of the elements of "just cause."

#### II. The Board Did Not Err in Its Conclusion that Employer Had Adequately Shown "Just Cause" for Petitioner's Discharge.

¶19    Petitioner argues that because Employer did not adequately show culpability or knowledge, it failed to establish just cause and the Board accordingly erred in denying her claim. We disagree.

A.    The Board's Conclusion that the Severity of Petitioner's Actions Outweighed Her Work History Was Not Unreasonable or Irrational.

¶20    In order to demonstrate culpability, the employer must show the following:

> The conduct causing the discharge must be so serious that continuing the employment relationship would jeopardize the employer's rightful interest. If the conduct was an isolated incident of poor judgment

and there was no expectation it would be continued or repeated, potential harm may not be shown. The claimant's prior work record is an important factor in determining whether the conduct was an isolated incident or a good faith error in judgment. An employer might not be able to demonstrate that a single violation, even though harmful, would be repeated by a long-term employee with an established pattern of complying with the employer's rules. In this instance, depending on the seriousness of the conduct, it may not be necessary for the employer to discharge the claimant to avoid future harm.

Utah Admin. Code R994-405-202(1). Petitioner argues that it was error for the Board to conclude that her work history—containing only isolated incidents of discipline, none of which related to accessing private files for personal reasons—did not outweigh the severity of her actions. Employer responds by arguing that it was neither unreasonable nor irrational for the Board to conclude that the severity of Petitioner's actions was such that termination was necessary in order to protect its "rightful interests."

¶21    In *Kehl v. Board of Review of the Industrial Commission*, 700 P.2d 1129 (Utah 1985), an employee was terminated after failing to follow her employer's safety policies and procedures for transporting explosives across a set of railroad tracks. *Id.* at 1131–32. Although the employee's termination was based upon a single instance of misconduct, the Utah Supreme Court ultimately concluded that the employer had adequately shown culpability. *Id.* at 1134. Specifically, the court observed that "a single violation of a safety rule may be sufficient to show that the potential harm to the employer's interests warranted discharge." *Id.* It also emphasized that the analysis of culpability should not focus "upon the number of violations" but rather upon the "problem of whether the discharge was necessary to avoid actual or potential harm to the employer's rightful interest." *Id.* (citation and internal quotation marks omitted).

¶22   In this case, the Board determined that despite Petitioner's generally favorable work history, her conduct was "so egregious as to warrant immediate discharge." This is so because, according to both the Board and the ALJ, Employer had a rightful interest in preserving the public trust and avoiding any liability that might ensue if court employees accessed private files for personal reasons.

¶23   The United States Supreme Court has observed that the power of the judicial branch lies "in its legitimacy, [which is] a product of substance and perception that shows itself in the people's acceptance of the Judiciary as fit to determine what the Nation's law means and to declare what it demands." *Planned Parenthood of Se. Pa. v. Casey*, 505 U.S. 833, 865 (1992). We believe that this is especially true with respect to our juvenile courts, which aspire to "act in the best interests of the minor in all cases and preserve and strengthen family ties," while acting "consistent with the ends of justice." Utah Code Ann. § 78A-6-102(5)(g) (LexisNexis 2012). As an employer, therefore, the state judiciary has a "rightful interest" in preserving a legitimate, positive public perception of the judiciary by demanding that judges and judicial employees conduct themselves with the highest levels of integrity.

¶24   Consonant with this goal, the judiciary has adopted rules similar to GRAMA regarding court records, exhibits, and files. *See* Utah R. Jud. Admin. 4-202. In fact, portions of these rules specifically address juvenile court records and restrict access to juvenile court "social" and "legal" records. *Id.* R. 4-202.02(6)–(7), -202.03(5)–(6) (classifying certain records as juvenile "social" or "legal" records and restricting access to them). Specifically, rule 4-202.03 of the Utah Rules of Judicial Administration permits court personnel to access court records "only to achieve the purpose for which the record was submitted." *Id*. R. 4-202.03. And finally, as pointed out by Employer, there are also policies in place governing the conduct of juvenile probation officers that encourage them to "observe high standards of conduct so that the Judiciary is preserved, and public confidence [in] the judiciary is promoted." Thus, it cannot be disputed that Petitioner's accessing CARE records for purposes outside of her employment responsibilities

was inconsistent with rules and policies restricting such access and designed to ensure confidentiality.

¶25　In light of the foregoing, the ALJ correctly observed that "[t]he public expects government and court records to be kept confidential" and that "Employer risks liability and [loss of] public trust if employees access computer records for personal reasons." We also defer to the Board's finding that given the presence of the statutes, rules, and policies discussed above, it is inconceivable that any state employee—much less an employee with over eighteen years of experience as a public servant within the judicial branch—would not realize that accessing confidential case files for personal reasons violates the public's trust and ultimately serves to undermine the legitimacy of the judiciary. Accordingly, it was neither unreasonable nor irrational for the Board to conclude that despite her favorable work history, Petitioner's actions were "so egregious as to warrant immediate discharge." Indeed, even though Petitioner may have been able to access some of the same information through the parental section of the MyCase website, it is clear that most of the information she accessed—including the substance abuse evaluation of her child's co-defendant and the files of another probation officer and her co-workers—was not available to other parents through MyCase and that accessing them was therefore a serious violation. Thus, the Board's determination that Employer adequately demonstrated culpability was both rational and reasonable.

B.　It Was Not Error for the Board To Conclude that Petitioner Knew that Her Conduct Was Unacceptable.

¶26　Petitioner also argues that the Board erred in concluding that Employer had adequately met the "knowledge" requirement of just cause. Specifically, she argues that she never received any training or written policies regarding the use of the CARE database and that Employer never issued a warning regarding her conduct. As noted above, however, the Board concluded that "it is inconceivable that any state employee would not know that state employees cannot access private records unless there is a legitimate business purpose for doing so."

¶27 In order to show "knowledge," an employer must show that the employee "had knowledge of the conduct the employer expected." Utah Admin. Code R994-405-202(2). In this case, Petitioner's own admissions show that she knew that the files of the other supervisors she was accessing were private and that those supervisors were entitled to a "right to privacy." In her letter dated May 29, 2013, she stated, "I already know your response to the majority of this letter, you are going to say that each individual [probation officer] has a right to privacy and I respect that . . . ." This admission is sufficient to establish knowledge because it shows that Petitioner knew that both Employer and the other supervisors expected these files to remain private. This conclusion is further buttressed by the observations made in the prior section of this opinion regarding the near-universal knowledge among both government employees and the public at large that many government records—and particularly many juvenile court records—are confidential, that accessing them for non-business purposes is prohibited, and that such access can lead to serious consequences. Accordingly, it was neither irrational nor unreasonable for the Board to conclude that Employer had adequately proven the "knowledge" element of just cause.

CONCLUSION

¶28 The Board did not err by failing to first determine whether Petitioner had violated a specific statute, policy, rule, or universal standard of conduct. Rather, it correctly applied the "just cause" standard for denying unemployment benefits, and its analysis of the elements of that standard do not depart from the "bounds of reasonableness and rationality." Accordingly, we decline to disturb the Board's denial of Petitioner's claim.

———————