**2015 UT App 292**

# THE UTAH COURT OF APPEALS

GEORGE W. NECKEL,
Petitioner,

*v.*

DEPARTMENT OF WORKFORCE SERVICES, WORKFORCE APPEALS
BOARD; AND CONTEMPO CABINET & MILL, INC.,
Respondents.

Memorandum Decision
No. 20140901-CA
Filed December 3, 2015

Original Proceeding in this Court

David J. Holdsworth and Jeffrey D. Holdsworth,
Attorneys for Petitioner

Suzan Pixton, Attorney for Respondent Department
of Workforce Services, Workforce Appeals Board

JUDGE JOHN A. PEARCE authored this Memorandum Decision, in
which JUDGES GREGORY K. ORME and KATE A. TOOMEY concurred.

PEARCE, Judge:

¶1     George W. Neckel seeks judicial review of the Workforce
Appeals Board's (the Board) decision denying his application for
unemployment benefits. We conclude that substantial evidence
supports the Board's factual determinations. We also conclude
that the Board's decision falls within the bounds of
reasonableness and rationality. Accordingly, we decline to
disturb the Board's decision.

¶2     Neckel worked for Contempo Cabinet & Mill, Inc.
(Contempo) as a cabinet maker. Throughout his employment
with Contempo, Neckel had concerns regarding workplace
safety and Contempo's business practices. He sporadically
shared these concerns with his supervisor. Neckel ultimately

quit his employment with Contempo, not because of these concerns but because of issues he had experienced with a fellow employee (Coworker). Coworker, a twenty-eight-year-old bodybuilder nicknamed Rambo, harassed the fifty-nine-year-old Neckel about his age and perceived inability to work without assistance from others. Coworker had similarly negative interactions with other Contempo employees. By way of example, Coworker once locked an employee in a jobsite outhouse. On another occasion, Coworker squeezed another employee's shoulders so hard that Neckel believed the employee would buckle from the pain. At least one Contempo employee began carrying pepper spray and a taser out of fear of Coworker. According to Neckel, Contempo's responses to Coworker's actions were anemic at best.

¶3    The Friday prior to Neckel leaving Contempo's employ, Neckel set up fans in the workplace. Coworker told Neckel that he did not want to "smell stinky old men," and demanded that Neckel turn off the fans. Neckel responded with insults, using "a couple of choice four-letter words," and said "some pretty nasty stuff to [Coworker]." Coworker ran at Neckel with his fists clenched and threatened to "kick [Neckel's] butt," but Coworker never struck Neckel. Neckel left the work area without reporting the incident to his supervisor.

¶4    The following Monday, Neckel's supervisor approached him regarding the confrontation. Neckel informed his supervisor that he could no longer work with Coworker because Coworker's actions made him fear for his physical safety. Neckel then completed the workday without incident. On Tuesday, Neckel further discussed his concerns regarding Coworker's hostile behavior with his supervisor. The supervisor acknowledged Neckel's concerns and informed Neckel that Coworker's employment with Contempo would be terminated. After this conversation, Neckel returned to work.

¶5    Shortly after Neckel returned to work on Tuesday, Coworker approached Neckel and informed him that the two

would be working together that day. Neckel became upset and told his supervisor that he could not work with Coworker and was leaving. The supervisor told Neckel he needed more time to find a replacement for Coworker, informing Neckel that Contempo was "too short-handed right now" to fire Coworker without obtaining a replacement. Neckel nevertheless left the jobsite, stating, "I can't do this . . . . I gotta go."

¶6    The supervisor called Neckel on Wednesday and left him a voicemail stating that the supervisor wanted to discuss the situation. Neckel returned the supervisor's call later in the day, but not before he applied for unemployment benefits. When Neckel returned the call, the supervisor informed Neckel that he wanted to work it out and invited Neckel to come speak with the owner's son, who ran Contempo's shop. Neckel told the supervisor that he had already applied for unemployment benefits and he did not believe the situation could be resolved. This was the last communication Neckel had with Contempo. Neckel never returned to work.

¶7    The Department of Workforce Services (the Department) denied Neckel's claim for unemployment benefits, finding that Neckel voluntarily quit without good cause. The Department also rejected Neckel's argument that it would be contrary to equity and good conscience to deny him unemployment benefits. Neckel appealed to an Administrative Law Judge (the ALJ), who affirmed the Department's denial of benefits. Neckel next appealed to the Board, which affirmed the ALJ's decision. Neckel now seeks judicial review.

¶8    Neckel argues that certain Board findings of fact are not supported by substantial evidence: (1) that Neckel quit his employment voluntarily for a reason that disqualified him from receiving unemployment benefits; (2) that he failed to establish good cause to quit; and (3) that the circumstances surrounding his departure did not satisfy the equity and good conscience standard. When reviewing an administrative agency's findings of fact, we do so in the light most favorable to the agency,

*Evolocity, Inc. v. Department of Workforce Servs.*, 2015 UT App 62, ¶ 2, 347 P.3d 1066, and we will uphold the agency's findings if they are supported by substantial evidence, *id.* ¶ 4. "Substantial evidence is more than a mere scintilla of evidence . . . though something less than the weight of the evidence." *Cook v. Labor Comm'n*, 2013 UT App 286, ¶ 14, 317 P.3d 464 (omission in original) (citation and internal quotation marks omitted).

¶9 Neckel first argues that there was not substantial evidence to support the Board's finding that Neckel quit voluntarily. "A separation is considered voluntary if the claimant was the moving party in ending the employment relationship." Utah Admin. Code R994-405-101(1). There is no dispute that Neckel, rather than Contempo, was the moving party in ending the employment relationship: Neckel walked off the job in response to his ongoing difficulties with Coworker. *See Chapman v. Industrial Comm'n*, 700 P.2d 1099, 1101 (Utah 1985) (characterizing claimant's walking off the job after longstanding abuse from supervisor as a voluntary quit). Neckel also declined Contempo's offer to attempt to preserve the employment relationship. These facts support the Board's finding that Neckel's departure from Contempo was a voluntary quit.[1]

¶10 Second, Neckel argues that substantial evidence does not support the Board's finding that he did not have good cause to quit. Neckel, as the claimant, "has the burden to establish that the elements of good cause . . . have been met." Utah Admin. Code R994-405-105. Good cause to quit is evaluated by "the objective standard of whether a reasonably prudent person would be justified in quitting under similar circumstances."

---

1. Neckel also argues that there is not substantial evidence supporting the Board's determination that he quit for a disqualifying reason. We do not separately analyze this argument because it appears to be coextensive with Neckel's argument that he had good cause to quit.

*Sawyer v. Department of Workforce Servs.*, 2015 UT 33, ¶ 30, 345 P.3d 1253 (citation and internal quotation marks omitted). To establish good cause, a claimant must show that continuing his employment would "have caused an adverse effect which the claimant could not control or prevent" and that "an immediate severance of the employment relationship was necessary." Utah Admin. Code R994-405-102. Further, a finding of good cause requires that the claimant's "separation must have been motivated by circumstances that made the continuance of the employment a hardship or matter of concern, sufficiently adverse to a reasonable person so as to outweigh the benefits of remaining employed." *Id.* R994-405-102(1)(a). Even though the employee may have been adversely affected, good cause does not exist if the employee could have "reasonably . . . continued working while looking for other employment," "had reasonable alternatives . . . to preserve the job," or if the employee "did not give the employer notice of the circumstances causing the hardship thereby depriving the employer of an opportunity to make changes that would eliminate the need to quit." *Id.* R994-405-102(1)(b). Thus, the employee "must have made a good faith effort to work out the differences with the employer before quitting unless those efforts would have been futile." *Id.* R994-405-102(1)(b)(iii).

¶11 Here, the Board found that Neckel's decision to quit was without good cause and was unreasonable, because Neckel chose to leave work without first giving Contempo a chance to either discharge Coworker or arrange for Neckel and Coworker to work separately. Neckel argues that he had good cause to make Tuesday his last day at work. Specifically, Neckel contends he was forced to quit by Contempo's failure to remedy the situation and his fear for his physical safety caused by Coworker's actions. Neckel points to Contempo's failures to address his previous concerns regarding Contempo's workplace safety and business practices and argues that Contempo's failure to respond to those prior complaints left him with no reason to

believe that Contempo would remedy his concerns for his physical safety.

¶12  Neckel's disagreement with the Board's determination does not demonstrate the absence of substantial evidence to support the Board's finding. Although Neckel did not report the fan incident, his supervisor approached him on the next working day to discuss the matter. The day after that, the supervisor acknowledged to Neckel that Coworker's behavior was a problem and stated that he would seek Coworker's discharge. When Neckel walked off the job shortly thereafter, he did so despite his supervisor's plea for more time to find a replacement for Coworker. Neckel's refusal to allow Contempo a reasonable opportunity to discharge Coworker or otherwise allay Neckel's concerns is substantial evidence supporting the Board's finding that Neckel did not make a good faith effort to preserve his employment or seek to resolve his differences with Contempo. Contempo's intent to remedy the situation is further demonstrated by the supervisor's call to Neckel on the day after Neckel walked off the job, requesting a chance to further discuss the situation. The Board could reasonably conclude that a "reasonably prudent person" would have continued discussions with Contempo before quitting, especially in light of Contempo's expressed intent to discharge Coworker. *See Sawyer*, 2015 UT 33, ¶ 30 (citation and internal quotation marks omitted).

¶13  Furthermore, Neckel has not provided evidence of an adverse effect which he could not control or prevent, requiring the immediate termination of his employment. *See* Utah Admin. Code R994-405-102. By Neckel's own admission, the only occasion on which Coworker physically threatened Neckel was in response to Neckel responding to Coworker's comment with "choice four-letter words." Moreover, Coworker never physically harmed Neckel. While Neckel's concerns about Coworker appear to be justified, as Contempo recognized, we hold that the Board's finding that Neckel quit without good

cause is supported by substantial evidence under the particular circumstances of this case.[2]

¶14 Third, Neckel argues that the Board erred in finding that the circumstances surrounding Neckel's departure did not satisfy the equity and good conscience standard. Neckel carries the burden to establish that equity and good conscience requires the payment of unemployment benefits. Utah Admin. Code R994-405-105. "Determining what constitutes equity and good conscience presents a mixed question of law and fact . . . ." *Hadley v. Workforce Appeals Bd.*, 2013 UT App 145, ¶ 9, 303 P.3d 1037 (citation and internal quotation marks omitted). Where, as here, such a mixed question is "fact-like," our review is deferential to the Board. *Jex v. Utah Labor Comm'n*, 2013 UT 40, ¶ 15, 306 P.3d 799 (citation and internal quotation marks omitted).

¶15 The equity and good conscience standard provides that benefits may be awarded to the claimant when: "there are mitigating circumstances"; "a denial of benefits would be unreasonably harsh or an affront to fairness"; the claimant has "acted reasonably"; and the claimant has demonstrated "a continuing attachment to the labor market."[3] *See* Utah Admin.

---

2. To be clear, we can readily envision situations where the aggressive actions of a coworker would provide good cause to leave employment. We merely hold that on the facts before the Board in this case—including Contempo's attempt to resolve the situation and Neckel's departure before hearing what Contempo would propose as a remedy—the Board's finding is supported by substantial evidence.

3. Here, there is no dispute regarding the claimant's successful attachment to the labor market, and we recognize that Coworker's behavior is a mitigating circumstance. Therefore, we need only examine whether the Board's determination that

(continued…)

Code R994-405-103. A claimant acts reasonably "if the decision to quit was logical, sensible, or practical. There must be evidence of circumstances which, although not sufficiently compelling to establish good cause, would have motivated a reasonable person to take similar action . . . ." *Id.* R994-405-103(1)(a); *see also Hadley*, 2013 UT App 145, ¶ 9. However, we will not engage in a "free-wheeling judicial foray into the record" to impose a decision based on our "collective sense of equity and fairness."[4] *Pritcher v. Department of Emp't Sec.*, 752 P.2d 917, 919 (Utah Ct. App. 1988). Rather, our analysis of the fact-like issue before us "must reflect the broad discretion conferred by the legislature upon the [Board]." *Adams v. Board of Review of Indus. Comm'n*, 776 P.2d 639, 642 (Utah Ct. App. 1989).

¶16 The Board affirmed the ALJ's finding that Neckel did not act reasonably and found no mitigating circumstances that made a denial of benefits unduly harsh or an affront to fairness. The ALJ stated that Neckel

> could have continued his employment and given [Contempo] adequate time to deal with concerns without experiencing any personal harm. [Neckel] acted unreasonably by not giving the [Contempo] time to deal with his concerns. Because [he] did not act reasonably an allowance of benefits cannot be granted under the equity and good conscience provision.

---

(…continued)
Neckel acted unreasonably is supported by substantial evidence, and whether the Board's denial of benefits was unreasonably harsh or unfair.

4. If such a foray were permitted, at least one member of this court's panel would have decided in Neckel's favor.

Neckel disagrees, arguing that one "cannot look at his decision to quit due to the confrontation with his coworker in a vacuum." He asserts that his decision to quit should be based on the entire record, not just the isolated incident with Coworker, and that the entire record indicates that his decision was reasonable.

¶17    The Board's denial of benefits was within the bounds of reasonableness and rationality, and it was not unduly harsh or an affront to fairness. The record does not indicate that Neckel ever approached his supervisor to complain about Coworker's behavior. Rather, Neckel's supervisor raised the issue with him. On the day Neckel left Contempo, his supervisor informed him that the supervisor would resolve the situation by discharging Coworker as soon as a replacement could be located. After Neckel left, his supervisor contacted him in an effort to get Neckel back to work. Although Contempo's response may not have been the definitive response that Neckel desired, it was reasonable for the Board to conclude that Neckel should have responded to Contempo's attempts to remedy his concerns with Coworker before deciding that his work situation could not be salvaged. Neckel's situation with Coworker may have been uncomfortable and intimidating; however, there is no indication in the record that Neckel was in immediate physical danger. Even taking into account Neckel's concerns and work history with Contempo, evidence supports the Board's finding that Neckel's decision to leave without allowing Contempo additional time to remedy the situation was unreasonable—especially given the supervisor's expressed support for Neckel—and that withholding benefits would not be unreasonably harsh or an affront to fairness. Thus, we decline to disturb the Board's decision denying Neckel benefits under the equity and good conscience standard.

¶18    Neckel argues that, here, the question of equity and good conscience is controlled by *Chapman v. Industrial Commission*, 700 P.2d 1099 (Utah 1985), wherein the Utah Supreme Court held "that as a matter of law the equity and good conscience standard

has been satisfied." *Id.* at 1102. However, *Chapman* addressed circumstances that are factually distinguishable from this case. In *Chapman*, an employee suffered through five years of increasingly severe abuse by her immediate supervisor. *Id.* at 1100–01. The employee walked off the job on Christmas Eve after the supervisor began screaming and swearing at her for no reason. *Id.* at 1101. The employee maintained that she had not reported her supervisor's erratic and abusive behavior to management because the supervisor was in poor health and the employee did not want the supervisor to lose her job. *Id.* at 1102. The supreme court concluded that, under these circumstances, even though the employee could not demonstrate good cause for her decision to quit, it would violate equity and good conscience to deny her benefits. *Id.* Here, the Board could reasonably conclude that on the different facts presented in this case—Neckel's relatively recent[5] difficulties with a coworker rather than his supervisor, which Contempo was attempting to remedy—equity and good conscience did not require the payment of benefits.

¶19 Neckel also argues that the Board's overall application of law to the facts was outside the bounds of reasonableness and rationality. We will uphold the Board's application of the law to the facts "unless its determination exceeds the bounds of reasonableness and rationality." *Brehm v. Department of Workforce Servs.*, 2014 UT App 281, ¶ 12, 339 P.3d 945 (citation and internal quotation marks omitted). For the same reasons that we have upheld the Board's factual findings—essentially, Neckel's failure to give Contempo reasonable opportunity to resolve the situation with Coworker despite Contempo's expressed intention to do so—we also uphold the Board's application of

---

5. The record does not indicate how long Coworker had been mistreating Neckel and the other Contempo workers, but at oral argument, Neckel's counsel agreed that it was a matter of "weeks or months," not months or years.

the law to the facts. The Board applied the law to the facts reasonably and rationally, and given the deferential standard of review, we cannot disturb the Board's application of the law to the facts simply because it could have reasonably reached a contrary conclusion.

¶20    The Board's factual determinations are supported by substantial evidence, and its application of law to the facts was both rational and reasonable. We therefore decline to disturb the Board's decision denying Neckel's petition for unemployment benefits.

––––––––––